HUGH MELDRUM, Plaintiff, *v.* EDITH M. MELDRUM and Another, Defendants.

Supreme Court, Onondaga County, May 5, 1930.

*Clifford H. Searle,* for the plaintiff.

*Harry E. Newell,* for the defendant.

*Lapham, McGreevy & Ryan* [*Nathan D. Lapham* of counsel], for the corespondent.

Ross, Official Referee. The parties were married in 1920; no children. In 1926 the husband and wife lived near Penn Yan; moved to Syracuse in December, 1926, where they lived until this action was commenced on April 8, 1929.

The plaintiff claims he first discovered evidence of his wife's adultery in February, 1929, but had suspicions in 1926. (Stenographer's Minutes, p. 20.) The corespondent is forty years old; a married man; owns, or is employed in, a garage in Penn Yan. The plaintiff apparently is strong both physically and intellectually. The defendant is frail physically and of nervous temperament.

It is claimed that the adultery was committed about December 1, 1925, at the home of the parties near Penn Yan at a place called Bluff Point where they were living at the time. There is no dispute that the corespondent went to Bluff Point on the day in question in 1926 in a car owned and driven by the witness Allison; that the corespondent asked the witness Allison to stop; that he desired to look at a car; that the corespondent got out of the car and the witness Allison remained therein; that the corespondent went to the door or side porch of the house where the defendant lived, and was at the time, and stood for a moment at the door of the house; did not go in.

The following is an excerpt from Allison's evidence: " Q. And then what? A. Then he came back, I should say in a matter of a couple of minutes, just a short time and stepped out onto the

porch at the door again and then he came and got into the car." (Stenographer's Minutes, p. 358.)

This witness fixes the time from the fact that he was getting ready to go to Florida.

The evidence of adultery rests upon a letter (Exhibit 1) written to her husband, dated March 28, 1929, at his request and mailed by him to himself (Stenographer's Minutes, pp. 163, 164), in which the writer admitted having committed adultery with the corespondent three years before at the defendant's home near Penn Yan. The defendant made similar admissions to her sister-in-law, the witness Ann Meldrum, and also to the process server, the witness Kinney D. Dutcher.

The admissions to Dutcher were in response to specific questions asked by him as to the details of her wrongdoing (Stenographer's Minutes, pp. 58, 60), that she signed the statement, and that the paper was read over to her and she was crying at the time. (See p. 81.) All of this is strongly suggestive that the defendant was following the instructions of the plaintiff.

The defendant made admissions to the witness Ann Meldrum. This was at a conversation had at the table in the house of the parties after the witness had learned of the trouble between them. The witness testifies as follows (p. 26): " I said about this trouble and talk of separation and leaving, what does it mean? I said in New York there are just two reasons for such serious things. One is desertion and we must eliminate that, and the other is infidelity, and as Hugh [the plaintiff] is the one speaking of leaving, what is the answer? She [the defendant] said, ' I am guilty of infidelity.' ' Well,' I said, ' Maude, I am very, very sorry.' I said, ' Have you met someone you care for more than you do for Hugh? ' She said, ' No, Heavens, no.' ' Well,' I said, ' I can't imagine a woman allowing such liberties with a man she cares nothing about.' And she said, ' Well, that [naming the corespondent] thinks he owns every woman.' "

Testimony of defendant: Defendant testifies: That she had known the corespondent several years, but her only association with him was in 1918 when, her brother having gone into the military service, she desired to learn to drive the car which her brother had formerly driven. The garage man in Penn Yan sent the corespondent out to teach her, he being in the employ of the former. That she took three or four lessons. That on those occasions either one of her brothers or her mother was with her. That in December, 1926, the time the plaintiff alleges adultery was committed, the corespondent came to the house at Bluff Point where she and her husband resided, and it appears that she was there alone. That this was

in the daytime. That the corespondent told her he wanted to look at the old car and see if he might buy it for the parts. In her language, " I told him where it was and he went and looked at it and returned and said he might make some use of it. That he would come Sunday and tell Hugh [the plaintiff] whether he would take it," which he subsequently did. That he was there not to exceed fifteen minutes, and that the corespondent did not on that occasion come into the house, and the defendant specifically denies that she then or at any time committed adultery.

Further (Stenographer's Minutes, p. 155), that her husband went away in the morning saying that he was going to Rochester, and that he would be home at ten o'clock that night. This was in the latter part of February, 1929. That he did not return until the next morning, claiming that he had lost his train, and that the witness remained up all night. " The next morning he would not speak to me and I asked him the reason and he said, ' That he couldn't get along with me any longer,' and I asked him why, and he said he couldn't just seem to; that we couldn't agree on anything and he wanted to get a separation. I said, ' Well, Hugh, why? ' ' Because,' he said, ' he couldn't have children, couldn't be happy without children in the home.' " (Stenographer's Minutes, p. 155.)

And she states again (p. 156) that he said on another occasion, " I have got through living with you," and that he had been to see a lawyer in regard to getting separation papers, and " I said, ' Maybe it would be best to get separation papers,' and it was agreed upon."

And again subsequently at midnight they had another talk. " I said, ' Hugh, why can't we be happy? ' (Stenographer's Minutes, p. 157.) He said, ' Just for the reason that we can't have children.' And I said, ' Well, it is very strange that you should change the way you have in a short time,' and I wrote the letter about which my sister-in-law [Mrs. Foltz] has testified. Q. And did he ask you to write? A. He asked me to write that I had relations with the corespondent. * * * I told him I would not do it because it wasn't so and he said I would do it and he kept at me and kept at me and he stood over me while this letter was written and told me to write it. * * * He said that the letter would have to contain that I had relations with the corespondent. * * * I said I wouldn't write it because it wasn't so and he said I would have to write it in order to get a separation. * * * I wrote that I had relations with the party but I wouldn't tell who. Q. Didn't mention any names? A. I mentioned no names. Q. Just that you had relations? A. Yes. * * * Q. Now what did he say to you was the reason he wanted you to do that? A. Just so that he could get separation papers for us both. * * *

He talked to me hours up into the night before I wrote that letter and he told me that if I didn't write that letter that he would commit suicide.  *  *  *  Well, I wrote it then by him standing over me making me write and telling me what to write.  *  *  * I addressed it and he mailed it the next morning.  *  *  * Addressed to himself at Brown, Lipe Gear Company.  I saw him put it in the mail.  On the corner — 154 South Avenue."

That night they went out for a ride, and the witness says her husband said (p. 164): " Now that you have written the letter and feel so upset, we shall go out for a ride and quiet your nerves." This was the time that he put the letter addressed to himself in the mail box.  " After I had written that letter, he told me when he got home that that was an admission that we could get the separation papers on."  " I said I would not [that is, name a corespondent], because it wasn't true and he said maybe it is not true but you will have to do that in order for us to get separation papers.  And I asked him how he knew that, and he said his attorney told him that.  Q. Was anything mentioned as to whom you should mention as the party?  A. Yes."

And later on the witness, in answer to the question who should be mentioned as corespondent, said: " ' Why do you say that it was [naming the corespondent]? ' and he said, ' Because I have suspicions that he was.'  I said; ' Why should you have suspicions that it was [the corespondent]? '  And he said ' Because he had been coming here and that he was the only one that could be named.'  Q. That is that he was the only possible one that could be named?  A. Yes. Q. What reply did you make?  A. I said that if that was the only one, maybe he could be the only one.  It was not to please him but I would write it because I was so worried.  I was afraid he would do something to himself."  (P. 168.)

And again the witness says (p. 170): " He said that if I would write this letter and sign it, we could get separation papers quietly and no one else would know anything about it.  It could be settled out of court and there would not be any trouble whatever."

And again: " Yes, he said that if I would do that for him that I would get the same papers he would get; that I could go my way and he could go his and there would be no more question after that. Q. Did he say anything about any money matter?  A. Yes.  He said that he would pay me $10.00 a week alimony for a year and after that I could get work for myself.  Q. What was said, if anything, as to what would happen if you didn't do this?  A. He said he would leave me and would commit suicide because he wanted to get a divorce and separation so badly."  (P. 171.)

With reference to the conversation with Mr. Dutcher:  The

witness does not deny that Mr. Dutcher gives substantially the conversation, but she said (on p. 187): " That is all I recall. I was crying and taking on so and sobbing that I really couldn't say that that was all he said. He talked, but that was all he said and I sobbed and cried and took on so that I didn't comprehend what he said."

And again the witness said that she did not take the paper into her hands or read it, but she denies (on p. 190) that she ever stated that the corespondent ever kissed her or that he ever made any advances to her; that Dutcher ever read such statement as that before she signed the exhibit in evidence. " Q. Was there any conversation between your husband that night and you or any subsequent time in regard to the visit of this man Dutcher and the statement that you had signed? (Pp. 194, 195.) A. Yes. He asked me if anyone had been there that evening. I told him, ' Yes.' A man that Mr. Searle sent to get an admission from me and then after that he asked me what he said. * * * Yes, I said, he had, and told him just what I told in that letter. * * * He said at that time, ' Well, the only thing to do now is to wait for the papers that should be brought to you tomorrow.' And I said, ' All right, but Hugh it does not seem possible that you can go on with this when you know it is not true.' Q. What did he say? A. He said, That is all right, we want the separation papers and we are going to have them."

On page 198, upon the examination of the defendant, she says in answer to the question: "Q. How did your feelings manifest themselves if they did manifest themselves? A. I cried, walking the floor night and day, wringing my hands. Q. And what were you doing when Dutcher came up? A. I was crying and walking the floor. Q. There is one thing that I want to ask you further. It is perhaps a little leading. Did he say anything to you as to what would happen in regard to the payment of the $10.00 a week in case you did anything about any publicity or publicity being given to this matter? * * * A. He said he would stop the payments if I said — if there was anything said outside of this, that he would stop the payments." (P. 199.)

And it subsequently appears that upon the appearance of the defendant in this case the payments were stopped.

The instant case lacks evidence of previous association of the defendant and the corespondent, of frequent meetings, of acts of familiarity, and endearing words, and conduct showing a criminal inclination which usually precedes or accompanies guilty intercourse.

Condonation or forgiveness: The evidence would sustain a finding that the plaintiff had forgiven the defendant. (See Civ. Prac. Act,

§ 1153, subd. 2.) The plaintiff's suspicions entertained in 1926 and which he claims were confirmed in 1929. (See pp. 173, 174.) From the time of the first alleged confession down to the 1st of April, 1929, they continued to live as man and wife, occupying the same bed. (*Pepin* v. *Pepin*, 123 Misc. 888, 889, EDGCOMB, J.)

Alleged confessions of defendant not corroborated: The plaintiff's uncorroborated confessions are not sufficient evidence to justify a decree of divorce.

Chancellor KENT held in the case of *Betts* v. *Betts* in 1814 (1 Johns. Ch. 197) that a divorce will not be granted upon an uncorroborated confession. This utterance has received the sanction of the courts for over a century. (*Lyon* v. *Lyon*, 62 Barb. 138; *Madge* v. *Madge*, 42 Hun, 524; *Krauss* v. *Krauss*, 73 App. Div. 509; *Monypeny* v. *Monypeny*, 171 id. 134; *Marshall* v. *Marshall*, 55 App. D. C. 173; 3 F. [2d] 344.)

If a divorce can be obtained on uncorroborated confession of the defendant, it would in such a case be within the power of the parties to sever the marriage relation at will. (30 Harv. Law Rev. 520.)

The statements or confessions of the defendant to different witnesses are not corroborating evidence of each other. They are simply repetitions. The only corroborating evidence in the instant case is the evidence of the witness Mary Foltz, a sister-in-law of the defendant (See Stenographer's Minutes, p. 88), to the effect that in 1926 the parties lived within a quarter of a mile of the witness' home; that the witness had a talk with the defendant on the same day that the corespondent visited the home of the Meldrums; that the defendant asked the witness, " Did you see the co-respondent up there?" (I assume that by " up there " was meant the defendant's home.)

In view of the admitted fact that the corespondent did go to the Meldrum premises on business, and in view of the evidence of the witness Martin Allison in whose car the corespondent rode when he went to the Meldrum home, who testified that the corespondent was on defendant's porch a couple of minutes (p. 358), the above question of the defendant can hardly be dignified into a corroboration of the defendant's confessions made three years later under the circumstances disclosed herein.

The fact is, the defendant got tired of his wife, and very nearly succeeded in getting rid of her. It may be that he thought she was guilty, but it does not clearly appear why it took him three years to learn that his wife was guilty of adultery. It is not reasonable to suppose that the defendant, after three years of married life, said to a husband, who told her in substance that he was tired of her, that three years before she had committed adultery. It is under the cir-

cumstances just about as reliable evidence as the statements forced from the wretch who was put to the question in the torture chamber of the Middle Ages.

Counterclaim — cruelty: It follows that the counterclaim of the defendant must be allowed. The plaintiff only stopped short of physical violence to get rid of his wife, not hesitating to blacken her reputation in the manner disclosed by the evidence at the best would be unjustifiable and at the worst was extreme cruelty.

As to what constitutes cruelty, the case of *Gardner* v. *Gardner* (206 App. Div. 789; affd., 237 N. Y. 623, in both cases without opinion).

The facts in the case cited were different from those in the instant case, but the cases are similar in the fact that in the *Gardner* case there were no acts or threats of violence. (See Appeal Book; *Heylmun* v. *Heylmun*, 119 Misc. 113, RODENBECK, J.; *Morris* v. *Morris*, 108 id. 228; *Comfort* v. *Comfort*, 227 App. Div. 1, 2d Dept.)

In the case last cited the acts of cruelty alleged that the plaintiff had been disloyal to the government of the United States and that she had been afflicted with epilepsy. It was held that these unproved allegations constituted cruelty sufficient to warrant a decree of separation.

Judge CUTHBERT W. POUND of the Court of Appeals in an address to the Bar Association in Rochester on October 30, 1923, used the following language: " The common law of England bases the domestic relations largely on a concept of the property of the husband and father in the wife and child. * * * Cruelty implied only physical abuse. But the American courts, with a more refined feeling of the basis of marital right, find difficulty in resting such wrongs on a property theory. * * * "

Corespondent: We have a situation which presents grave possibilities for injustice. The corespondent named in divorce cases is usually guilty, but, before a man or woman's character is blasted and their own home and marital relations threatened, it should be based upon something more than an uncorroborated confession, a confession which in the instant case was subsequently deliberately retracted. In the instant case the person named as corespondent appeared and denied the charge upon the stand. He explains why and how he came to be at the residence of the parties in November or December, 1926, and denies any wrongdoing, and he produces some residents, men of good character in the community where he and they reside, and who, so far as rules of evidence would permit, vouch for the truthfulness and good character of the corespondent.

Comments on plaintiff's brief: The learned counsel for the

plaintiff, in a carefully prepared brief, to sustain his contention as to whether the confessions of the defendant were corroborated, sets forth at length opinions from several cases. The cases cited illustrate the well-known fact that each case stands on its own foundation. General rules are understood, but the facts in no two cases are absolutely alike. For instance, the case of *Monypeny* v. *Monypeny* (171 App. Div. 134), cited by the attorney. In this case the referee had found that the defendant was guilty, but the court at Special Term, being dissatisfied with the proof, refused to confirm the referee's report. The court, upon appeal, reversed the order of the Special Term, refusing to confirm the referee's report.

In the case cited the plaintiff had a favorable finding on the facts, while in the instant case he is about to have a finding antagonistic to his claim.

The counsel also cites the Special Term case in the Superior Court of New York city of *Sigel* v. *Sigel* (20 N. Y. Supp. 377, 378), in which Judge McAdam says: "In this case the court must determine the facts as a jury would have done, and its finding thereon is equally conclusive."

I believe that, upon the facts presented, not one jury in ten would find for the plaintiff, not because the defendant is a woman, but because one gets the impression that she has been unjustly and wrongfully treated.

Findings to be submitted. Judgment of separation to be decreed. Twelve dollars a week alimony, payable weekly. Costs to defendant and cost of trial to the corespondent.